# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HALEY STEVENS, individually and on behalf of her minor child, C.L., <br><br>        Plaintiff, <br><br> v. <br><br> GLAXOSMITHKLINE, LLC <br><br>        Defendant. | CIVIL ACTION NO. <br><br> JURY TRIAL DEMANDED <br><br> SECTION: <br><br> MAGISTRATE: |

## COMPLAINT

Now into Court, through undersigned counsel, comes Plaintiff, Haley Stevens, Individually and on behalf of her child, C.L., a minor, who files this Complaint with Jury Demand and alleges as follows:

## NATURE OF THE CASE

1.     This action is brought on behalf of Plaintiff Haley Stevens, individually and on behalf of her minor child, C.L., who seeks compensatory and punitive damages, and such other relief as is just and proper arising from the injuries caused to C.L. as a result of prenatal exposure to the prescription drug Zofran, also known as ondansetron.

2.     Zofran is a drug that was approved by the Food and Drug Administration (hereinafter "FDA") in 1991 to treat severe nausea in cancer patients undergoing chemotherapy and radiation treatments. To date, this remains the only FDA-approved use for Zofran.

3.      GlaxoSmithKline (hereinafter "GSK") marketed Zofran "off label" as a safe and effective treatment for pregnancy-related nausea and vomiting, commonly called "morning sickness."

4.      GSK engaged in this "off label" marketing despite never having conducted a single study on the effects of Zofran on pregnant women or their unborn children.  GSK chose not to study Zofran in pregnant women or seek FDA approval before marketing the drug for treatment during pregnancy.

5.      As a result, Zofran was prescribed to unsuspecting pregnant women throughout the United States. Pregnant women ingested Zofran because they were led to believe that Zofran was safe to use for the treatment of pregnancy-related nausea. Pregnant women who ingested Zofran had no way of knowing that their use of Zofran increased the risk that their unborn children would develop serious birth defects.

6.      At the same time GSK was marketing Zofran to pregnant women, GSK knew that Zofran was unsafe for ingestion by pregnant women. GSK conducted animal studies in the 1980s which revealed evidence of toxicity, intrauterine deaths, and malformations in offspring. These studies also demonstrated that Zofran's active ingredient transferred through the placental barrier of pregnant mammals to fetuses. A later study conducted in humans confirmed that ingested Zofran readily crossed the human placental barrier and exposed fetuses to substantial concentrations. GSK did not disclose this information to pregnant women or their physicians.

7.      By 1992, GSK had a multitude of evidence linking Zofran to birth defects. GSK received at least 32 reports of birth defects associated with Zofran by 2000, and has received more than 200 such reports to date. Nevertheless, GSK did not disclose the reports to pregnant women

or their physicians. In addition, scientists have conducted large-scale epidemiological studies that have demonstrated an elevated risk of developing birth defects such as those suffered in this case. GSK has never disclosed this information to pregnant women or their physicians. Instead, GSK sales representatives continued to market and promote Zofran as a drug for pregnancy-related nausea at all times relevant to this case.

8.      GSK pled guilty in 2012 to criminal charges brought by the U.S. Department of Justice regarding its "off-label" promotion of drugs for uses that were never approved by the FDA.

9.      At or around the same time, GSK also entered into civil settlements with the United States that included more than $1 billion in payments to the federal government for its illegal marketing of various drugs, including Zofran specifically.

10.     GSK's written agreement with the United States reports GSK's settlement of allegations that GSK:

> (a) "promoted the sale and use of Zofran for a variety of conditions other than those for which its use was approved as safe and effective by the FDA (including hyperemesis and pregnancy-related nausea)"
>
> (b) "made and/or disseminated unsubstantiated and false representations about the safety and efficacy of Zofran concerning the uses described in subsection (a) [hyperemesis and pregnancy-related nausea]"
>
> (c) "offered and paid illegal remuneration to health care professionals to induce them to promote and prescribe Zofran"

(Exh. A, Settlement Agreement, p. 5, July 2, 2012.)

11.     GSK's fraudulent and unlawful conduct in the marketing and promotion of Zofran as a safe morning sickness drug to pregnant women has caused serious and irreversible damage to innocent children and their families, including Plaintiff and her minor child C.L.

12.     GSK negligently and improperly failed to perform sufficient and adequate testing on pregnant women using Zofran during clinical trials. This inadequate testing evinced a callous, reckless, and willful indifference to the health, safety, and welfare of pregnant women and their unborn children, including Plaintiff and her minor child C.L.

13.     As a result of the foregoing acts and omissions, Plaintiff's minor child C.L. suffered serious and dangerous birth defects caused by exposure to Zofran while in utero.  C.L.'s injuries include, but are not limited to a dead or missing kidney and hydronephrosis.

14.     Therefore, Plaintiff seeks compensatory and punitive damages, and such other relief as is just and appropriate arising from injuries caused by Plaintiff's ingestion of Zofran while she was pregnant with her minor child.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiff and Defendant GSK.

16.     Venue is proper in the United States District Court for the Northern District of Mississippi, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in that District, and because Defendant GSK conducts substantial business in that District.  Nonetheless, this action is properly filed in the United States District Court for the District of Massachusetts, pursuant to this Court's MDL Order No. 6, ¶1.

17.     This Court has personal jurisdiction over Defendant GSK because it has done business in the State of Mississippi, has committed a tort in whole or in part in the State of Mississippi, has substantial and continuing contact with the State of Mississippi, and derives

substantial revenue from goods used and consumed with the State of Mississippi. Defendant GSK actively advertises, sells, markets, distributes, and/or promotes its pharmaceutical product Zofran to physicians and consumers in the State of Mississippi on a regular and consistent basis.

## PARTIES

18.     Plaintiff and her minor child, C.L., are citizens and residents of the State of Mississippi and were citizens and residents of the State of Mississippi at all times relevant to the allegations in this Complaint.  Plaintiff's minor child, C.L., upon information and belief, suffered severe personal injuries as a result of Plaintiff's use of Zofran while Plaintiff was pregnant with C.L.

19.     Defendant GSK is a limited liability company organized under the laws of the State of Delaware. GSK's sole member is GlaxoSmithKline Holdings, Inc., which is a Delaware corporation, and which has identified its principal place of business as Wilmington, Delaware.

20.     GSK is the successor in interest to Glaxo, Inc. and Glaxo Wellcome Inc.  Glaxo, Inc. was the sponsor of the original New Drug Application ("NDA") for Zofran. Glaxo, Inc., through its division Cerenex Pharmaceuticals, authored the original package insert and labeling for Zofran, including warnings and precautions attendant to its use. Glaxo Wellcome Inc. sponsored additional NDAs for Zofran, monitored and evaluated post-market adverse event reports arising from Zofran, and authored product labeling for Zofran. The term GSK used herein refers to GSK, its predecessors Glaxo, Inc. and Glaxo Wellcome Inc., and other GSK predecessors and/or affiliates that discovery reveals were involved in the testing, development, manufacture, marketing, sale and/or distribution of Zofran.

21.     Upon information and belief, GSK has transacted and conducted business in the State of Mississippi.

22.     Upon information and belief, GSK has derived substantial revenue from goods and products used in the State of Mississippi.

23.     Upon information and belief, GSK expected or should have expected its acts to have consequence within the United States and the State of Mississippi, and derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

24.     Upon information and belief, and at all relevant times, GSK was in the business of and did design, develop, research, manufacture, test, advertise, promote, market, sell, and/or distribute the drug Zofran for use by pregnant women as an anti-nausea, "morning sickness" medication.

## ZOFRAN-SPECIFIC FACTUAL BACKGROUND

25.     Zofran is a drug that was approved by the FDA in 1991 to treat severe nausea in cancer patients undergoing chemotherapy and radiation treatments. To date, this remains the only FDA-approved use for Zofran.

26.     The Zofran Prescribing Information as of September 2014 provides as follows:

INDICATIONS AND USAGE

1. Prevention of nausea and vomiting associated with highly emetogenic cancer chemotherapy, including cisplatin $\geq$ 50 mg/m2.

2. Prevention of nausea and vomiting associated with initial and repeat courses of moderately emetogenic cancer chemotherapy.

3. Prevention of nausea and vomiting associated with radiotherapy in patients receiving either total body irradiation, single high-dose fraction to the abdomen, or daily fractions to the abdomen.

4. Prevention of postoperative nausea and/or vomiting.

(Exh. B, Zofran Prescribing Information, Sept. 2014.)

27.     Zofran is an anti-emetic (a drug that prevents or treats nausea and vomiting) belonging to a class of anti-emetics called selective serotonin 5HT3 receptor anatagonists. The active ingredient in Zofran is ondansetron hydrochloride, an antagonist at the 5-hydroxytryptamine receptor type 3 (5-HT3).

28.     Serotonin triggers nausea and vomiting in the human body. Zofran works by inhibiting the body's serotonin activity.

29.     Zofran is available as an injection (2 mg/mL), a premixed injection (32 mg/50ml and 4 mg/50 ml), oral tablets (4 mg, 8 mg and 24 mg), orally disintegrating tablets (4 mg and 8 mg), and an oral solution (4 mg/5 mL).

30.     GSK has obtained FDA approval for the following formations of Zofran:

a. NDA 20-007 – Zofran Injection (FDA approved January 4, 1991);

b. NDA 20-103 – Zofran Tablets (FDA approved December 31, 1992);

c. NDA 20-403 – Zofran Premixed Injection (FDA approved January 31, 1995);

d. NDA 20-605 – Zofran Oral Solution (FDA approved January 24, 1997);

e. NDA 20-781 – Zofran (a/k/a Zofran-Zydis) Orally Disintegrating Tablets (FDA approved January 27, 1999).

31.     The FDA has never approved Zofran for the treatment of morning sickness or any other condition in pregnant women.

32.     In order to market Zofran lawfully for treating morning sickness in pregnant women, GSK is required to test the drug adequately for that purpose (including to perform appropriate clinical studies) and to submit formally evidence demonstrating that the drug is safe and effective for that purpose to the FDA. Without obtaining FDA approval to market a drug for the treatment of pregnant women, GSK may not legally market its drug for that purpose.

33.     Despite having the resources and capability to perform appropriate studies, GSK has not performed any clinical studies to determine the effect on pregnant women who take Zofran.

34.     Further, GSK has not submitted any data to the FDA demonstrating that Zofran is safe and effective for treating pregnancy-related nausea in pregnant women. Rather, GSK has illegally circumvented the FDA approval process by marketing Zofran for the treatment of pregnancy-related nausea in pregnant women without having applied for the FDA's approval to market Zofran to treat that condition or any other condition in pregnant women. This practice is known as "off-label" promotion, and in this case it constitutes fraudulent marketing.

35.     At all times relevant to this case, GSK was in the business of and did design, research, manufacture, test, package, label, advertise, promote, market, sell and distribute Zofran; GSK continues to market and sell Zofran "off label" today.

36.     Since, at the latest, the 1980s, when GSK received the results of the preclinical studies that it submitted in support of Zofran's NDA 20-007, GSK has known of the risk that Zofran ingested during pregnancy in mammals crosses the placental barrier to expose the fetus to the drug. For example, in the mid-1980s, GSK performed placental-transfer studies of Zofran in

rats and rabbits, and reported that the rat and rabbit fetuses were exposed prenatally to Zofran during pregnancy.

37.     The placental transfer of Zofran during human pregnancy at concentrations high enough to cause congenital malformations has been independently confirmed and detected in every sample of fetal tissue taken in a published study involving 41 pregnant patients. The average fetal tissue concentration of Zofran's active ingredient was 41% of the corresponding concentration in the mother's plasma.

38.     GSK reported four animal studies in support of its application for approval of NDA 20-0007: (1) Study No. R10937 I.V. Segment II teratological study of rats; (2) Study No. R10873 I.V. Segment II teratological study of rabbits; (3) Study No. R10590 Oral Segment II teratological study of rats; (4) Study No. L10649 Oral Segment II teratological study of rabbits. These preclinical teratogenicity studies in rats and rabbits were stated by the sponsor, GSK, to show no harm to the fetus, but the data also revealed clinical signs of toxicity, premature births, intrauterine fetal deaths, and impairment of ossification (incomplete bone growth).

39.     Study No. R10937 was a Segment II teratological study of pregnant rats exposed to Zofran injection solution. Four groups of 40 pregnant rats (160 total) were reportedly administered Zofran through intravenous (I.V.) administration at doses of 0, 0.5, 1.5, and 4 mg/kg/day, respectively. Clinical signs of toxicity that were observed in the pregnant rats included "low posture, ataxia, subdued behavior and rearing, as well as nodding and bulging eyes." No observations were reported as teratogenic effects.

40.     Study No. R10873 was a Segment II teratological study of pregnant rabbits exposed to Zofran injection solution. Four groups of 15 pregnant rabbits (60 total) were reportedly given

Zofran doses of 0, 0.5, 1.5, and 4 mg/kg/day, respectively. The study showed an increase in the number of intra-uterine deaths in the 4 mg/kg group versus lower-dosage groups. The study also reported maternal weight loss in the exposed groups. Developmental retardation in offspring and fetuses were noted—namely, areas of the parietal (body cavity) were not fully ossified, and the hyoid (neck) failed to ossify completely.

41.     Study No. R10590 was an Oral Segment II teratological study of rats. Four groups of 30 pregnant rats (120 total) were given Zofran orally at doses of 0, 1, 4, and 15 mg/kg/day, respectively. Subdued behavior, labored breathing (which is a symptom of congenital heart defects), and dilated pupils were observed in the 15 mg/kg/day group. Body weight, gestational duration, and fetal examinations were reported as normal, but "slight retardation in skeletal ossification" was noted in the offspring.

42.     Study No. L10649 was an Oral Segment II teratological study of rabbits. Four groups of 14-18 pregnant rabbits (56-64 total) were given Zofran orally at doses of 0, 1, 5.5 and 30 mg/kg/day. The study reported lower maternal weight gain in all of the exposed groups, as well as premature delivery and "total litter loss," referring to fetal deaths during pregnancy in the 5.5 mg/kg/day group. Examination of the fetuses showed "slight developmental retardation as evident by incomplete ossification or asymmetry of skeleton."

43.     Even if it is assumed that these animal studies do not conclusively reveal evidence of potential harm to a fetus exposed to Zofran, GSK was aware that animal studies are not necessarily predictive of human response. For example, a drug formerly prescribed to alleviate morning sickness, thalidomide, is an infamous teratogenic in humans, but animal studies involving the drug failed to demonstrate such an increased risk of birth defects in animals. GSK conducted studies of thalidomide and its toxicity before GSK developed Zofran and before it marketed Zofran

for the treatment of morning sickness in pregnant women. Moreover, since 1993 or earlier, GSK has stated in its prescribing information for Zofran that "animal reproduction studies are not always predictive of human response." Therefore, GSK has been aware since at least when it began marketing and selling Zofran that GSK could not responsibly rely on its animal studies as a basis for promoting Zofran use in pregnant women. GSK nevertheless went forward with marketing and promoting Zofran to pregnant women.

44.     GSK began receiving reports of birth defects associated with the use of Zofran by pregnant women as early as 1992. By 2000, GSK had received at least 32 reports of birth defects associated with Zofran, including reports of congenital heart disease, dysmorphism, intrauterine death, stillbirth, kidney malformation, congenital diaphragmatic anomaly, congenital musculoskeletal anomalies, and orofacial anomalies, among others.

45.     To date, GSK has received more than 200 reports of birth defects in children who were exposed to Zofran while in utero. Upon information and belief, the number of such events that were actually reported to GSK comprises only a small fraction of all such events.

46.     Three recent epidemiological studies have examined the association between prenatal exposure to Zofran and the risk of congenital heart defects in babies. These studies include: (1) Pasternak, *et al.*, Ondansetron in Pregnancy and Risk of Adverse Fetal Outcomes, New England Journal of Medicine (Feb. 28, 2013) (the "Pasternak Study"); (2) Andersen, *et al.*, Ondansetron Use in Early Pregnancy and the Risk of Congenital Malformations—A Register Based Nationwide Control Study, presented as International Society of Pharmaco-epidemiology, Montreal, Canada (2013) (the "Andersen Study"); and (3) Danielsson, *et al.*, Ondansetron During Pregnancy and Congenital Malformations in the Infant (Oct. 31, 2014) (the "Danielsson Study").

47.     Each of these studies employs methodologies tending to bias results toward under-reporting the true risk of having a child with a birth defect. Despite this, all three studies show elevated risk ratios for cardiac malformations, including risk ratios greater than 2.0. In other words, the studies report that a mother who ingested Zofran had more than a double risk of having a baby with a congenital heart defect compared to a mother who did not ingest Zofran while pregnant.

48.     The Pasternak Study included data from the Danish National Birth Registry and examined the use of Zofran during pregnancy and risk of adverse fetal outcomes. Adverse fetal outcomes were defined as: spontaneous abortion, stillbirth, any major birth defect, pre-term delivery, low birth weight, and small size for gestational age. A total of 608,385 pregnancies between January 2004 and March 31, 2011, were studied. The unexposed group was defined as women who did not fill a prescription for ondansetron during the exposure time window. The exposure time window was defined as the first 12-week gestational period. Notably, the median fetal age at first exposure to Zofran was 10 weeks, meaning that half of the cases were first exposed to Zofran after organogenesis (organ formation). This characteristic of the study led to an under-reporting of the actual risk of prenatal Zofran exposure. The study's supplemental materials indicated that women taking Zofran during the first trimester, compared to women who did not take Zofran, were 22% more likely to have offspring with a septal defect, 41% more likely to have offspring with a ventricular septal defect, and greater than four times more likely to have offspring with an atrioventricular septal defect.

49.     The Andersen Study was also based on data collected from the Danish Medical Birth Registry and the National Hospital Register, the same data examined in the Pasternak Study. The Andersen study examined the relationship between Zofran use during the first trimester and subgroups of congenital malformations. Data from all women giving birth in Denmark between

1997 and 2010 were included in the study. A total of 903,207 births were identified in the study period with 1,368 women filling prescriptions for Zofran during the first trimester. The Andersen Study therefore used a larger data set (13 years) compared to the Pasternak Study (seven years). Exposure to the drug was also defined as filling a prescription during the first trimester, and prescription data were obtained from the National Prescription Registry. The Andersen study reported that mothers who ingested Zofran during their first trimesters of pregnancy were more likely than mothers who did not to have a child with a congenital heart defect, and had a two- to four-fold greater risk of having a baby with a septal cardiac defect.

50.     The Danielsson Study investigated risks associated with Zofran use during pregnancy and risk of cardiac congenital malformations from data available through the Swedish Medical Birth Registry. The Swedish Medical Birth Registry was combined with the Swedish Register of Prescribed Drugs to identify 1,349 infants born to women who had taken Zofran in early pregnancy from 1998-2012. The total number of births in the study was 1,501,434 infants, and 43,658 had malformations classified as major (2.9%). Among the major malformations, 14,872 had cardiovascular defects (34%) and 10,492 had a cardiac septum defect (24%). The Danielsson study reported a statistically significantly elevated risk for cardiovascular defects for mothers taking Zofran versus those who did not. The results reported that the mothers who took Zofran during early pregnancy had a 62% increased risk of having a baby with a cardiovascular defect. Further, mothers who took Zofran during pregnancy had a greater than two-fold increased risk of having a baby with a septal cardiac defect, compared to mothers who did not take Zofran during pregnancy.

51.     It is clear that, since as early as 1992, GSK has been privy to mounting evidence that Zofran poses an unreasonable risk of harm to babies exposed to the drug while in utero. GSK

has been aware that Zofran readily crosses human placental barriers during pregnancy. GSK has also been aware that the animal studies of Zofran cannot reliably support an assertion that Zofran can be used safely or effectively in pregnant women. Since 1992, GSK has received hundreds of reports of major birth defects associated with prenatal Zofran exposure. GSK also has had actual and/or constructive knowledge of the epidemiological studies reporting that prenatal Zofran exposure can more than double the risk of developing congenital heart defects. As alleged below, GSK not only concealed this knowledge from healthcare providers and consumers in the United States and failed to warn of the risk of birth defects, but GSK also illegally and fraudulently promoted Zofran to physicians and patients specifically for the treatment of morning sickness in pregnant women.

52.     Federal law governs GSK's drug labeling obligations for its pharmaceutical products, including Zofran, and federal law requires GSK to "describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur." 21 C.F.R. § 201.57(e).

53.     Federal law also requires GSK to list adverse reactions that occurred with other drugs in the same class as Zofran. *Id.* at § 201.57(g).

54.     In the context of prescription drug labeling, "an adverse reaction is an undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence." *Id.*

55.     Federal law also required GSK to revise Zofran's labeling "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." *Id.* at § 201.57(e)

56.     GSK has received hundreds of reports of birth defects associated with the non-FDA-approved use of Zofran in pregnant women. GSK has failed, however, to disclose these severe adverse events to healthcare providers or expectant mothers, including Plaintiff and her prescribing healthcare providers.

57.     Under 21 C.F.R. § 314.70(c)(2)(i), pharmaceutical companies were (and are) free to add or strengthen—without prior approval from the FDA—a contraindication, warning, precaution, or adverse reaction.

58.     GSK thus had the ability and obligation to add warnings, precautions and notice of adverse reactions to the product labeling for Zofran without prior approval from the FDA. GSK failed to do so.

59.     Under 21 C.F.R. § 201.128:

> [I]f a manufacturer knows, or has knowledge of facts that would give him notice, that a drug introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a drug which accords with such other uses to which the article is to be put.

60.     GSK has known since 1998 or earlier, on the bases of its off-label promotion and payments to doctors, its obvious increase in revenue from Zofran, and its market analyses of prescription data, that physicians were prescribing Zofran off-label to treat morning sickness in pregnant women and that such usage was associated with a clinically significant risk or hazard of causing birth defects.

61.     GSK had the ability and obligation to state prominently in the Indications and Usage section of its drug label that there is a lack of evidence that Zofran is safe for the treatment of morning sickness in pregnant women. GSK failed to do so, despite GSK's knowledge that (a)

the safety of Zofran for use in human pregnancy has not been established; (b) there have been hundreds of reports of birth defects associated with Zofran use during pregnancy; and (c) epidemiology studies report an increased risk of birth defects in babies exposed to Zofran during pregnancy.

62.     From 1993 to the present, despite GSK's being privy to mounting evidence of the birth defect risk, GSK's prescribing information for Zofran has included the same statement concerning use of Zofran during pregnancy:

> **Pregnancy:   Teratogenic   Effects**:   Pregnancy   Category   B.
> Reproduction studies have been performed in pregnant rats and
> rabbits at I.V. doses up to 4 mg/kg per day and have revealed no
> evidence of impaired fertility or harm to the fetus due to
> ondansetron. There are, however, no adequate and well-controlled
> studies in pregnant women. Because animal reproduction studies are
> not always predictive of human response, this drug should be used
> during pregnancy only if clearly needed.

63.     By contrast, the Product Monograph for Zofran in Canada states "the safety of ondansetron for use in human pregnancy has not been established" and that "the use of ondansetron in pregnancy is not recommended."

64.     In the United States, including in Mississippi, GSK has at all relevant times failed to include any warning regarding the risk of birth defects arising from the use of Zofran during pregnancy in Zofran's prescribing information or other product labeling.

65.     GSK's inclusion of the phrase "Pregnancy Category B" in Zofran's prescribing information refers to the FDA's pregnancy categorization scheme applicable to prescription drugs in the United States. The FDA has established five categories to indicate the potential of a drug to cause birth defects if used during pregnancy. The current system consists of five letter-categories (A, B, C, D, and X, in order of increasing risk).

66.   GSK had the ability, and indeed was required under federal law, to update Zofran's label to reflect at least a Pregnancy Category D designation, or alternatively a Category X designation for Zofran:

> **Pregnancy Category D**  If there is positive evidence of human fetal risk based on adverse reaction data from investigational or marketing experience or studies in humans, but the potential benefits from the use of the drug in pregnant women may be acceptable despite its potential risks (for example, if the drug is needed in a life-threatening situation or serious disease for which safer drugs cannot be used or are ineffective), the labeling must state: "Pregnancy Category D. See 'Warnings and Precautions' section." Under the "Warnings and Precautions" section, the labeling must state: "[drug] can cause fetal harm when administered to a pregnant woman [. . . .] If this drug is used during pregnancy, or if the patient becomes pregnant while taking this drug, the patient should be apprised of the potential hazard to a fetus."

21 C.F.R. § 201.57(f)(6)(i)(d).

> **Pregnancy Category X**  If studies in animals or humans have demonstrated fetal abnormalities or if there is positive evidence of fetal risk based on adverse reaction reports from investigational or marketing experience, or both, and the risk of the use of the drug in a pregnant woman clearly outweighs any possible benefit (for example, safer drugs or other forms of therapy are available), the labeling must state: "Pregnancy Category X. See 'Contraindications' section." Under "Contraindications," the labeling must state: "(Name of drug) may (can) cause fetal harm when administered to a pregnant woman [. . . .] (Name of drug) is contraindicated in women who are or may become pregnant. If this drug is used during pregnancy, or if the patient becomes pregnant while taking this drug, the patient should be apprised of the potential hazard to a fetus."

*Id.* at § 201.57(f)(6)(i)(e).

67.   By 1992 or earlier, GSK had evidence of human fetal risk posed by Zofran ingestion on the basis of more than 200 reports to GSK of birth defects, as well as epidemiology studies, and placental-transfer studies reporting on Zofran's teratogenic risk. GSK has never updated Zofran's labeling to disclose that Zofran can cause fetal harm when administered to a pregnant woman, and

GSK has failed to warn of the potential hazards to a fetus arising from Zofran use during pregnancy.

68.     The FDA recently promulgated a final rule declaring that, as of June 2015, it will require pharmaceutical manufacturers to remove the current A, B, C, D, or X pregnancy categorization designation from all drug product labeling and instead summarize the risks of using a drug during pregnancy, discuss the data supporting that summary, and describe relevant information to help health care providers make prescribing decisions and counsel women about the use of drugs during pregnancy and lactation. 79 Fed. Reg. 72064 (Dec. 4, 2014). In promulgating this rule, the FDA "determined that retaining the pregnancy categories is inconsistent with the need to accurately and consistently communicate differences in degrees of fetal risk."

69.     In summary, many years before Plaintiff was exposed to Zofran, GSK marketed and sold Zofran without adequately warning healthcare providers and consumers that Zofran was associated with an increased risk of birth defects and that GSK had not adequately tested Zofran to support marketing and promoting it for use in pregnant women. This rendered the warnings accompanying Zofran inadequate and defective.

70.     Plaintiff hereby demands that GSK immediately cease the wrongful conduct alleged herein for the benefit of Plaintiff and other similarly situated mothers and mothers-to-be, as GSK continues to engage in the same wrongful conduct. Plaintiff further demands that GSK fully and fairly comply with removing the Pregnancy Category B designation from its drug product labeling for Zofran, with fully and accurately summarizing the known risks of using Zofran during pregnancy, with fully and accurately describing the data supporting that summary, with fully and accurately describing the relevant information to help health care providers make informed

prescribing decisions, and with counseling women about the risks associated with use of Zofran during pregnancy.

## CASE-SPECIFIC FACTUAL BACKGROUND

71.     Plaintiff Haley Stevens is the mother and natural guardian of C.L. Plaintiff began using Zofran on or about May 2012, during her first trimester of pregnancy with C.L. Plaintiff ingested Zofran for the purpose of alleviating and preventing pregnancy-related nausea.

72.     Plaintiff's physician would not have prescribed Zofran to Plaintiff had her physician known of the true risks associated with the use of Zofran.

73.     At the time Plaintiff ingested Zofran, she was unaware of the dangers posed by ingesting Zofran during pregnancy, and she was unaware of the fraudulent nature of GSK's marketing of Zofran as a safe drug for the purpose of treating pregnancy-related nausea.

74.     Plaintiff would not have elected to use Zofran had she known of the true risks associated with the use of Zofran. In other words, Plaintiff would not have elected to use Zofran had she known that Zofran posed a risk of causing birth defects in her unborn child, C.L.

75.     C.L. was born on January 22, 2013.

76.     As a direct and proximate result of C.L.'s prenatal exposure to Zofran, C.L. was diagnosed with a dead or missing kidney and hydronephrosis.

77.     There is no known history of birth defects of the type suffered by C.L. in Haley Stevens's family.

78.     As a direct and proximate result of GSK's conduct, Plaintiff and her child C.L. have suffered and incurred damages, including severe and permanent pain and suffering, mental

anguish, medical expenses and other economic and non-economic damages, and will require more medical treatment than had they not been exposed to Zofran.

79.     Plaintiff files this lawsuit within the applicable three-year limitations period of first suspecting that Zofran caused the appreciable harm sustained by her child C.L.  Additionally, Plaintiff was prevented from discovering this information sooner because GSK has misrepresented to the public and to the medical profession that Zofran is safe for use in pregnancy, and GSK has fraudulently concealed facts and information that could have led Plaintiff to discover a potential cause of action.

## CAUSES OF ACTION

## COUNT I: NEGLIGENCE

80.     Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

81.     GSK had a duty to exercise reasonable care in the design, development, research, manufacture, marketing, supply, promotion, packaging, sale and/or distribution of Zofran into the stream of commerce, including but not limited to a duty to assure that the product would not cause users to suffer unreasonable and dangerous adverse side effects, to warn properly of all risks, and to comply with federal requirements.

82.     GSK failed to exercise ordinary care in the design, development, research, manufacture, marketing, supply, promotion, packaging, sale, testing, quality assurance, quality control, and/or distribution of Zofran into interstate commerce in that GSK knew or should have known that the use of GSK by pregnant women could cause significant harm to unborn children, including but not limited to physical injuries of a permanent and disabling nature, physical pain

and mental anguish, diminished enjoyment of life, and hospitalization and other medical expenses, and was therefore not safe for use by pregnant women.

83.    GSK's negligent acts and/or omissions include, but are not limited to:

a. Producing, manufacturing, formulating, designing, and/or advertising Zofran to pregnant women to treat morning sickness without sufficiently, thoroughly, and/or adequately testing it for that purpose;

b. Selling Zofran to pregnant women without performing sufficient/adequate testing to determine the full range of dangers to pregnant women;

c. Failing to warn Plaintiff, the general public, healthcare providers, and the FDA of the dangers associated with using Zofran during pregnancy;

d. Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with and/or use Zofran;

e. Failing to test Zofran and/or failing to test Zofran adequately, sufficiently and properly for use by pregnant women;

f. Negligently advertising and recommending the use of Zofran to Plaintiff, the general public, and healthcare providers without sufficient knowledge as to its dangerous propensities in pregnant women;

g. Negligently representing that Zofran was safe for use by pregnant women, when, in fact, it was unsafe;

h. Negligently representing that Zofran was as safe and effective as other available forms of treatment for morning sickness in pregnant women;

i. Negligently designing Zofran in a manner that was dangerous to users, including Plaintiff;

j. Negligently manufacturing Zofran in a manner that was dangerous to users, including Plaintiff;

k. Negligently producing Zofran in a manner that was dangerous to users, including Plaintiff;

l. Negligently assembling Zofran in a manner that was dangerous to users, including Plaintiff;

m. Knowingly concealing that Zofran was unsafe, dangerous, and/or non-conforming with FDA regulations from Plaintiff, the general public, and healthcare providers;

n. Improperly concealing and/or misrepresenting information regarding the risks and dangers posed by using Zofran during pregnancy.

84.     Despite the fact that GSK knew or should have known that Zofran significantly increased the risk of birth defects, GSK continued and continues today to manufacture and market Zofran for use by pregnant women and continues to fail to comply with federal requirements.

85.     GSK knew or should have known that consumers such as Plaintiff and her minor child would foreseeably suffer injury as a result of GSK's failure to exercise ordinary care as described above, including the failure to comply with federal requirements.

86.     It was foreseeable that GSK's product, as designed, would cause serious injury to consumers, including Plaintiff and her minor child.

87.     As a direct and proximate result of GSK's negligence, Plaintiff and her minor child were caused to suffer serious and dangerous side effects including, but not limited to, a dead or missing kidney, hydronephrosis, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

88.     GSK's conduct evinces a flagrant disregard for human life so as to warrant the imposition of punitive damages. This conduct includes but is not limited to: failing to adequately design, test, and manufacture GSK for use by pregnant women; marketing and distributing Zofran to pregnant women when GSK knew or should have known of the serious health risks it posed to unborn children; and failing to comply with federal requirements.

## COUNT II: NEGLIGENCE PER SE

89.     Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

90.     GSK had a duty to exercise reasonable care, and comply with existing laws, in the design, research, manufacture, marketing, supply, promotion, packaging, sale, testing, and/or distribution of Zofran into the stream of commerce, including a duty to ensure that the product would not cause users to suffer unreasonable, dangerous side effects.

91.     GSK failed to exercise ordinary care and failed to comply with existing laws in the design, research, manufacture, marketing, supply, promotion, packaging, sale, testing, quality assurance, quality control, and/or distribution of Zofran into interstate commerce in that GSK knew or should have known that using Zofran created an unreasonable risk of dangerous birth defects,

as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medication.

92.     GSK, its agents, servants, and/or employees, failed to exercise ordinary care and violated 21 U.S.C. § 331, 352; 42 U.S.C. § 1320a-7b; and 21 C.F.R. §§ 201.57, 201.128, in particular.

93.     The laws violated by GSK were designed to protect Plaintiff and similarly situated persons and to protect against the risks and hazards that have actualized in this case. Therefore, GSK's conduct constitutes negligence *per se*.

94.     Despite the fact that GSK knew or should have known that Zofran significantly increased the risk of birth defects, GSK continued and continues, negligently and misleadingly, to market, manufacture, distribute and/or sell Zofran to consumers, including Plaintiff.

95.     GSK knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of GSK's failure to exercise ordinary care, as set forth above.

96.     GSK's negligence was the proximate cause of Plaintiff's injuries, harm, and economic loss, which Plaintiff suffered and will continue to suffer.

97.     Had Plaintiff not taken Zofran, her minor child herein would not have suffered those injuries and damages as described in this Complaint.

98.     As a result of the foregoing acts and omissions, Plaintiff and her minor child herein were caused to suffer serious and dangerous side effects including, but not limited to, a dead or

missing kidney, hydronephrosis, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

## COUNT III: NEGLIGENT MISREPRESENTATION

99.     Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

100.    GSK falsely and fraudulently represented to pregnant women and the medical and healthcare community, including Plaintiff and her health care providers, that:

       a. Zofran was safe and effective for treating pregnancy-related nausea;

       b. Zofran had been adequately tested and studied in pregnant women;

       c. Zofran use during pregnancy did not increase the risk of bearing children with birth defects; and

       d. Zofran's "Pregnancy Category B" designation established the safety and efficacy of Zofran for treating pregnancy-related nausea.

101.    The representations made by GSK were material, false and misleading.

102.    GSK knew or should have known that the representations were false when it made the representations.

103.    In making these representations, GSK failed to exercise the degree of diligence and expertise the public is entitled to expect of a manufacturer, marketer, and seller of prescription drugs.

104.    At the time the aforesaid representations were made by GSK and at the time Plaintiff used Zofran, Plaintiff was unaware of the falsity of said representations and reasonably believed them to be true.

105.    In reliance upon said representations, Plaintiff's prescriber was induced to prescribe Zofran to her, and Plaintiff was induced to and did use Zofran to treat pregnancy-related nausea.

106.    GSK knew that Zofran had not been sufficiently tested for pregnancy-related nausea and that it lacked adequate warnings.

107.    GSK knew or should have known that exposure to Zofran increases the risk that children in utero will develop birth defects.

108.    As a result of the foregoing acts and omissions, Plaintiff and her minor child herein were caused to suffer serious and dangerous side effects including, but not limited to, a dead or missing kidney and hydronephrosis, as well as physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

**COUNT IV: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

109.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

110.    GSK negligently inflicted severe emotional distress upon Plaintiff by its negligent and careless actions, including, but not limited to:

a. Producing, manufacturing, formulating, designing, and/or advertising Zofran to pregnant women to treat morning sickness without sufficiently, thoroughly, and/or adequately testing it for that purpose;

b.  Selling Zofran to pregnant women without performing sufficient/adequate testing to determine the full range of dangers to pregnant women;

c.  Failing to warn Plaintiff, the general public, healthcare providers, and the FDA of the dangers associated with using Zofran during pregnancy;

d.  Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with and/or use Zofran;

e.  Failing to test Zofran and/or failing to test Zofran adequately, sufficiently and properly for use by pregnant women;

f.  Negligently advertising and recommending the use of Zofran to Plaintiff, the general public, and healthcare providers without sufficient knowledge as to its dangerous propensities in pregnant women;

g.  Negligently representing that Zofran was safe for use by pregnant women when, in fact, it was unsafe;

h.  Negligently representing that Zofran was as safe and effective as other available forms of treatment for morning sickness in pregnant women;

i.  Negligently designing Zofran in a manner that was dangerous to users, including Plaintiff;

j.  Negligently manufacturing Zofran in a manner that was dangerous to users, including Plaintiff;

k. Negligently producing Zofran in a manner that was dangerous to users, including Plaintiff;

l. Negligently assembling Zofran in a manner that was dangerous to users, including Plaintiff;

m. Knowingly concealing that Zofran was unsafe, dangerous, and/or non-conforming with FDA regulations from Plaintiff, the general public, and healthcare providers;

n. Improperly concealing and/or misrepresenting information regarding the risks and dangers posed by using Zofran during pregnancy.

111.    Had Plaintiff not taken Zofran, she and her minor child would not have suffered those injuries and damages as described hereinabove.

112.    As a result of the foregoing acts and omissions, Plaintiff and her minor child herein were caused serious injuries including, but not limited to, physical pain, mental anguish, and severe emotional distress.

## COUNT V: FRAUDULENT MISREPRESENTATION

113.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

114.    GSK falsely and fraudulently represented to pregnant women and the medical and healthcare community, including Plaintiffs and their providers, that:

a. Zofran was safe and effective for treating pregnancy-related nausea;

b. Zofran had been adequately tested and studied in pregnant women;

c. Zofran use during pregnancy did not increase the risk of bearing children with birth defects; and

d. Zofran's "Pregnancy Category B" designation established the safety and efficacy of Zofran for treating pregnancy-related nausea.

115.    The representations made by GSK were material, false and misleading.

116.    When GSK made these representations, it knew they were false.

117.    GSK made these representations with the intent of defrauding and deceiving the public in general, and the medical and healthcare community in particular, and the intent of inducing the public in general, and the medical and healthcare community in particular, including Plaintiff and her health care providers, to recommend, prescribe, dispense and/or purchase Zofran to treat pregnancy-related nausea, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety, and welfare of Plaintiff.

118.    At the time the aforesaid representations were made by GSK and, at the time Plaintiff used Zofran, she was unaware of the falsity of said representations and reasonably believed them to be true.

119.    In reliance upon said representations, Plaintiff's prescriber was induced to prescribe Zofran to her, and Plaintiff was induced to and did use Zofran to treat pregnancy-related nausea.

120.    GSK knew that Zofran had not been sufficiently tested for pregnancy-related nausea and that it lacked adequate warnings.

121.    GSK knew or should have known that Zofran increases expectant mothers' children's risk of developing birth defects.

122.    As a result of the foregoing acts and omissions, Plaintiff and her minor child herein were caused to suffer serious and dangerous side effects including, but not limited to, a dead or missing kidney and hydronephrosis, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

## COUNT VI: FRAUDULENT CONCEALMENT

123.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

124.    In representations to Plaintiff's healthcare providers, expectant mothers including Plaintiff, and the FDA, GSK fraudulently concealed and intentionally omitted the following material facts:

a. GSK was illegally paying and offering to pay doctors remuneration to promote and prescribe Zofran;

b. Zofran had not (and has not) been tested or studied in pregnant women at all;

c. in utero Zofran exposure increases the risk of birth defects;

d. the risks of birth defects associated with the consumption of Zofran by pregnant women were not adequately tested prior to GSK's marketing of Zofran;

e. the safety and efficacy of Zofran for treating pregnancy-related nausea have not been established;

f. Zofran is not safe and effective for treating pregnancy-related nausea; and

g. GSK's internal data and information associated Zofran use during pregnancy with birth defects.

125.    GSK's concealment and omissions of material facts concerning, among other things, the safety and efficacy of Zofran for pregnancy-related nausea were done purposefully, willfully, wantonly, and/or recklessly, to mislead physicians, hospitals and healthcare providers, and expectant mothers including Plaintiff into reliance and continued use of Zofran, and to cause them to promote, purchase, prescribe, and/or dispense Zofran.

126.    GSK knew that physicians, hospitals, healthcare providers and expectant mothers such as Plaintiff had no way to determine the truth behind GSK's concealment and material omissions of facts surrounding Zofran, as set forth herein.

127.    Plaintiff and her provider reasonably relied on GSK's promotional statements concerning Zofran's asserted safety and efficacy in pregnant women, from which GSK negligently, fraudulently, and/or purposefully omitted material facts.

128.    Plaintiff also has sustained severe emotional distress and suffering as a result GSK's wrongful conduct and the injuries to her minor child herein.

129.    As a result of the foregoing acts and omissions, Plaintiff and her minor child herein were caused to suffer serious and dangerous side effects including, but not limited to, a dead or missing kidney and hydronephrosis, as well as physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

## COUNT VII: BREACH OF IMPLIED WARRANTY

130.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

131.    GSK is a "merchant" in the business of the sale, marketing and distribution of prescription drugs, the kind of goods involved in this transaction.   When GSK designed, developed, manufactured, marketed, sold, and/or distributed Zofran for use by consumers like Plaintiff, GSK knew of the use for which Zofran was intended and impliedly warranted the product to be of merchantable quality and safe for use in the treatment of pregnancy-related nausea, and that its design, manufacture, labeling, and marketing complied with all applicable federal requirements.

132.    Plaintiff and her physician reasonably relied upon GSK's representations regarding Zofran's purported merchantable quality and its safety for use by pregnant women to treat pregnancy-related nausea, and, further, reasonably relied upon GSK's implied warranties, including that Zofran was in compliance with all federal requirements.

133.    Contrary to GSK's implied warranty, Zofran was not of merchantable quality or safe for use by pregnant women to treat pregnancy-related nausea, because the product was defective, as described herein, and failed to comply with federal requirements, of which GSK had notice.

134.    As a direct and proximate result of GSK's breach of warranty, Plaintiff and her minor child herein were caused to suffer serious and dangerous side effects including, but not limited to, a missing or dead kidney and hydronephrosis, as well as physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

## COUNT VIII: PRODUCTS LIABILITY

135.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

136.    At all times material to this action, GSK was engaged in the business of the design, development, manufacture, testing, packaging, promotion, marketing, distribution, labeling, and/or sale of Zofran.

137.    At all times material to this action, Zofran was expected to reach, and did reach, consumers in the State of Mississippi and throughout the United States, including Plaintiff herein, without substantial change in the condition in which it was sold.

138.    The subject product manufactured and/or supplied by GSK was defective in design in that an alternative design exists that would prevent serious side effects and severe and permanent injury to pregnant women and their unborn children. The product was unreasonably dangerous in design such that it would not have been put on the market by a reasonably prudent manufacturer or seller that knew of its dangerous condition.

139.    The subject product manufactured and/or supplied by GSK was unreasonably dangerous because GSK did not provide an adequate warning about the use of Zofran by pregnant women. At the time the subject product left GSK's control, it possessed a characteristic that may cause damage to pregnant women and their unborn children, and GSK failed to use reasonable care to provide an adequate warning of such characteristic and its danger, which it knew or should have known, to users and handlers of the product. The product is not safe, has numerous and serious side effects, and causes severe and permanent injuries. The product was unreasonably dangerous because of inadequate warning such that it would not have been put on the market by a reasonably prudent manufacturer or seller that knew of its dangerous condition.

140.    The subject product manufactured and/or supplied by GSK was unreasonably dangerous because it did not conform to an express warranty made by GSK regarding the product's

safety and fitness for use.  GSK's express warranty that Zofran was safe for use by pregnant women to treat pregnancy-related nausea induced Plaintiff to use the product, and Plaintiff's damages were proximately caused because GSK's express warranty was untrue. The product was unreasonably dangerous such that it would not have been put on the market by a reasonably prudent manufacturer or seller that knew of its dangerous condition.

141.   As a result of the foregoing acts and omissions, Plaintiff and her minor child herein were caused to suffer serious and dangerous side effects including, but not limited to, a missing or dead kidney and hydronephrosis, as well as physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

## PRAYER FOR RELIEF

Plaintiff respectfully requests judgment against GSK on each of the above counts as follows:

(a) Compensatory damages in excess of the jurisdictional amount, including, but not limited to past, present and future pain, suffering, mental anguish, emotional distress, loss of function, loss of enjoyment of life, and other noneconomic damages in an amount to be determined at trial of this action;

(b) Economic damages in the form of past, present and future medical expenses, special care and services, out of pocket expenses, travel expenses, lost earnings and other economic damages, including, but not limited to, all damages, past, present, and future, sustained as a result of the injury in an amount to be determined at trial of this action;

(c) Punitive and exemplary damages for the wanton, willful, fraudulent, and reckless acts of Defendant GSK, which demonstrated a complete disregard and reckless

indifference for the safety and welfare of the general public and Plaintiff, in an amount sufficient to punish Defendant GSK and deter future similar conduct;

(d) Pre-judgment and post-judgment interest as provided by law;

(e) Plaintiff's attorney fees;

(f) Plaintiff's costs of the proceedings, including expert fees;

(g) Any other damages that will be shown through discovery, proven at trial, and are recoverable by law; and

(h) Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all counts and as to all issues and allegations presented herein.

Respectfully submitted,

_____

**SANGISETTY LAW FIRM, LLC**

RAVI K. SANGISETTY (LA Bar No. 30709)
MICHAEL E. LILLIS (LA Bar No. 33245)
935 Gravier Street, Suite 835
New Orleans, La 70112
Telephone:    (504) 662-1016
Facsimile:    (504) 662-1318